CADDO GAS CO. et al. v. JEFFRIES et al.*
(No. 10913.)

(Court of Civil Appeals of Texas. Fort Worth. Jan. 10, 1925. Rehearing Denied Feb. 28, 1925.)

1. Pleading ⟨key⟩18—Allegation that defendant is guilty of certain wrongs should be unconditionally certain.

An allegation that defendant is guilty of certain wrongs resulting in injuries should be unconditionally certain.

2. Pleading ⟨key⟩34(1) — Sufficiency of petition must be considered as a whole as against general demurrer.

Petition must be considered as a whole, in passing on its sufficiency, as against general demurrer.

3. Gas ⟨key⟩20(4)—Negligence in turning in excessive gas pressure held for jury.

In an action for damages when plaintiff's house was destroyed by fire, resulting from explosion when defendant turned in an excessive pressure of gas, whether defendant was negligent *held* for jury.

4. Trial ⟨key⟩140(1)—Credibility of charts and witnesses producing them held for jury.

In action for damages, when plaintiff's house was destroyed by fire resulting from explosion when defendant turned in an excessive pressure of gas, credibility of charts showing that there had been no unusual pressure of gas in defendant's pipe lines, and witnesses who produced them, was for jury.

On Motion for Rehearing.

5. Gas ⟨key⟩20(1)—Allegations held sufficient to charge defendants with turning in excessive gas pressure.

In action for damages, when plaintiff's house was destroyed by fire resulting from explosion when defendants turned in an excessive pres-

sure of gas, allegations that either defendant or their agents turned into gas mains an excessive pressure of gas *held,* when construed with petition as whole, sufficiently to charge both defendants with turning on an excessive pressure of gas.

**6. Pleading ⬤══34(1)—Court authorized to look to defendant's answers in passing on general demurrer.**

In passing on general demurrer, court is authorized to look to defendant's answers.

**7. Pleading ⬤══35—Alternative allegation as to liability of defendant disregarded, where issue of joint liability presented in pleadings.**

In action for damages, when plaintiff's house was destroyed by fire resulting from explosion when defendant turned in an excessive pressure of gas, alternative allegations as to liability of defendants might be disregarded, where issue of their joint liability for turning in excessive pressure of gas was presented in pleadings.

**8. Evidence ⬤══75 — Failure of defendant to produce evidence authorized jury to draw unfavorable inference.**

In action for damages, when plaintiff's house was destroyed by fire resulting from explosion when defendants turned in an excessive pressure of gas, failure of defendant to produce meter chart as to time gas well was turned in on pipe lines, authorized jury to infer that if such testimony had been produced it would have been unfavorable to defendant.

**9. Evidence ⬤══77(1)—Failure of defendant to explain absence of witness authorized jury to draw unfavorable inference.**

In action for damages, when plaintiff's house was destroyed by fire resulting from explosion when defendant turned in an excessive pressure of gas, failure of defendant to explain absence of witness who could testify as to time oil well was turned in on pipe lines authorized jury to infer that his testimony would have been unfavorable to defendant.

Appeal from District Court, Stephens County; W. F. Schenck, Judge.

Action by Mrs. Ottie Jeffries and another against the Caddo Gas Company, the Texas Pacific Coal & Oil Company, and others. Judgment for plaintiffs, and last-named defendant appeals. Affirmed.

John Hancock, of Fort Worth, and Will R. Saunders, of Breckenridge, for appellant.

Benson & Dean, of Breckenridge, W. A. Shields, of Houston, and Merritt & Leddy, of Dallas, for appellees.

CONNER, C. J. The appellees Ottie Jeffries and her husband, L. J. Jeffries, filed this suit complaining of the Texas Pacific Coal & Oil Company and the Caddo Gas Company, a partnership composed of A. S. York, C. L. Young, and Bert Miller, and M. E. Stephens, trustee in bankruptcy of the estate of C. L. Young, in the district court of Stephens county.

Appellees alleged that on or about October 17, 1920, they were the owners of a dwelling situated in the town of Caddo, Stephens county, Tex., which had prior thereto been piped in a proper and careful manner to the Caddo Gas Company's gas line for the purpose of furnishing said dwelling with gas for fuel, heating, and cooking purposes; that the Texas Pacific Coal & Oil Company was furnishing the gas used by the citizens of Caddo to the Caddo Gas Company, or to the users thereof, and were so furnishing the same on or about October 17, 1920; that on or about that date the gas pressure became too low to furnish sufficient fuel for heating and cooking, and the Jeffries were using wood in its stead; that on or about said date the "Caddo Gas Company or the Texas Pacific Coal & Oil Company, or the Caddo Gas Company or some of their agents, employees, or representatives" turned into the gas mains in Caddo a gas pressure of such force that it blew off, bursted, and broke the connections, stops, cut-offs, and pipes in plaintiffs' residence; that as a result thereof plaintiffs' dwelling was set on fire and completely destroyed; that the defendants were guilty of negligence in the particulars above mentioned, which was the cause of the damage to plaintiffs; that the dwelling of plaintiffs was of the value of $7,000, the kitchen furniture of the value of $3,000, the wearing apparel and money $2,000, making a total value of $12,000, for which appellees sought recovery.

The appellant, Texas Pacific Coal & Oil Company, answered by way of a general demurrer, special demurrer, general denial, and plea of not guilty. The demurrers were overruled, and the trial resulted in a verdict and judgment in appellees' favor for the sum of $11,500. The judgment was rendered jointly and severally against the Caddo Gas Company, A. S. York, Bert Miller, and the Texas Pacific Coal & Oil Company for said amount. The defendants C. L. Young and M. E. Stephens, trustee, were dismissed with their costs. The appellant, Texas Pacific Coal & Oil Company, alone has prosecuted an appeal.

[1] The principal complaints, presented in various forms, are of the court's action in overruling the appellant's general and special demurrers, and that the evidence is insufficient to support the jury's verdict and the judgment. The demurrers are to the effect that the petition does not unconditionally allege the appellant to be guilty of the wrongs complained of, and does not allege the defendants to be joint tort-feasors. The basis of the complaint of the petition seems to rest upon the allegation hereinbefore quoted that the "Caddo Gas Company or the Texas Pacific Coal & Oil Company, or the Caddo Gas Company or some of their agents, employees, or representatives," turned into the

---

⬤══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

gas mains the. alleged excessive pressure of gas. It is quite true that an allegation that one or the other of the defendants committed an act which resulted in the damage complained of is insufficient in that it cannot be said therefrom which of the two defendants is the guilty party; in other words, the allegation standing alone leaves it uncertain that the Texas Pacific Coal & Oil Company was guilty of the wrongs complained of, whereas the allegation should be unconditionally certain. See Oglesby's Sureties v. State, 73 Tex. 658, 11 S. W. 873; Thorndale Mercantile Gas Co. v. Evans & Lee (Tex. Civ. App.) 146 S. W. 1053; Snipes v. Bomar Cotton Oil Co., 106 Tex. 181, 161 S. W. 1; Baker v. Galbreath (Tex. Civ. App.) 211 S. W. 626. So that, if the quoted allegation was all that was to be found in the petition, we would feel no hesitation in saying that the demurrers should have been sustained.

[2] But the rule is well settled that, in passing upon the sufficiency of a petition as against a general demurrer, the petition must be considered as a whole. In other words, all of its parts and allegations and not an isolated portion must be considered. And so considering the petition before us, we fail to find reversible error in the action of the court in overruling appellant's demurrers.

We will not quote extensively from the petition, but in some parts thereof the defendants were distinctly charged as joint wrongdoers. For instance, it was alleged that:

"The defendants nor none of them gave plaintiffs any notice that said high pressure would be and was going to be turned into said mains and laterals. * * * That said gas pressure was so great and severe that many of the gas pipes in the town of Caddo, especially those lying on top of the ground, walked, crawled or moved from the usual place, and that the defendants, each and all of them, well knew, or if they had used ordinary prudence and diligence of an ordinary prudent person, would have known, that said gas pressure was too strong and great for the pipes and plumbing and fixtures for gas purposes of those used by plaintiff and other citizens using gas in the town of Caddo, and if the defendants, each, either, or all of them, had used ordinary and proper care they would and could have prevented said high pressure being turned into the mains and pipes, including those in plaintiffs' residence; and thereby prevented the loss, destruction of plaintiffs' residence, * * * at least they could have notified plaintiffs that said high pressure was going to be turned into said mains and pipes and in plaintiffs' residence, which they did not do, so that plaintiffs could have used care to prevent said fire. That if the defendants had used proper care and diligence, as an ordinary prudent person would have done, they could and should have secured, obtained, and used proper appliances to prevent such high pressure coming direct from gas wells from entering the mains and pipes entering plaintiffs' residence."

It was further alleged:

"That the building of plaintiffs that was destroyed by fire on account of the carelessness and negligence of the defendants was worth at the time of such destruction * * * $12,000; that the sum of $12,000 would not replace said building, furniture, fixtures, and clothing and money that was lost and destroyed in said fire, caused by the negligence, wanton, willful, and unskillful management of the defendants, their employees and representatives or agents in turning in said high gas pressure which was the approximate and immediate cause of said fire."

These allegations, and perhaps others of similar import, we think are reasonably sufficient to show, notwithstanding the indefinite character of the isolated portion first quoted, that the appellant company and other defendants were each and all distinctly, jointly, and severally charged with the commission of the negligent acts complained of. The assignments and propositions relating to this subject are accordingly overruled.

In answer to special issues, the jury found that on or about the date alleged in the plaintiffs' petition the Caddo Gas Company turned into its lines an undue excess of natural gas, and was guilty of negligence in so turning in the gas or permitting it to be turned in, and that such negligence was the proximate cause of the injury complained of by plaintiffs. The jury also found that the appellant, the Texas Pacific Coal & Oil Company, on or about said time, turned in or caused to be turned into its lines "and into the lines of the Caddo Gas Company" an undue excess of natural gas, and that in so turning into or permitting such excess of gas into its lines or the lines of the Caddo Gas Company it was guilty of negligence, which was the proximate cause of the injury complained of by the plaintiffs. In answer to specially requested issues by the Caddo Gas Company, the jury further found that the pipe connections or cut-offs in plaintiffs' dwelling were blown off or bursted, on November 17, 1920, by the gas pressure in the Caddo Gas Company's lines; that neither the Caddo Gas Company nor any one else other than the Texas Pacific Coal & Oil Company opened the regulator of the Caddo Gas Company so that the same permitted an excessive gas pressure in the lines of the Caddo Gas Company; that the plumbing in the house of plaintiffs at the time the same was destroyed by fire was not defective.

The appellant, Texas Pacific Coal & Oil Company also requested a number of special issues which were given by the court and answered. These relate generally to the quantity and value of the goods destroyed by the fire, about which no question is raised, and which, therefore, need not be here specified. Among other questions, however, was one directing the jury to find for the appellant company, which was refused, and to which

exception is taken because it is insisted that the evidence did not warrant a judgment against this company.

[3] We have carefully examined the statement of facts, and conclude that the evidence fully warrants and supports the verdict and judgment. The evidence is abundant to the effect that on the date alleged the plaintiffs' house and its contents was destroyed by fire, and that for several weeks before the fire the gas pressure in the Caddo Gas Company's lines was low, to such an extent as that the inhabitants, many of them, were compelled to use wood and other fuel to supply their fires, but that on the occasion in question the gas lines of the Caddo Gas Company were so flooded with gas, of a pressure which in places bursted the lines, blew off attachments to gas stoves, etc., and the evidence shows that on the day of the fire appellees were not using gas but had a wood fire in the kitchen, which was left burning during a temporary absence of Mrs. Jeffries. Soon after Mrs. Jeffries' departure from the house, on a mission not necessary to state, the fire was discovered, and within a few moments Mrs. Jeffries returned, and she testified that:

"When I reached the house the whole end of the kitchen was blown out and burned, and the dining room was burning when I got there."

Another witness testified that he passed the house shortly before the fire and discovered nothing unusual with the premises, but that upon the alarm of the fire he repaired to the premises and found that one of the pipes which fed the house with gas, and only a short distance away, had bursted and was aflame. We think the jury was warranted in drawing the inference, as they evidently did, that the excessive pressure either bursted the gas pipes in the kitchen of plaintiffs or blew off the petcocks on their gas stove, as happened in other parts of town, and thus permitted gas to escape in the kitchen and become ignited from the wood fire, with the consequent loss of the house and contents.

As it seems to us, the only reasonably debatable question is whether the Texas Pacific Coal & Oil Company was guilty of negligence in turning into the gas lines of the Caddo Gas Company, or permitting the same to be done, an excessive pressure of gas. As already indicated, the jury has found that it was guilty of negligence in this respect, and, if so, it undoubtedly was the proximate result of the fire and loss in question.

C. E. Hampton testified:

That he remembered the occasion of the burning of the Jeffries house. That he had worked for the Caddo Gas Company three or four different times, both before and after the fire. That the Caddo Gas Company got its gas from the Texas Pacific Coal & Oil Company. That the lines of the two companies connected about one-fourth of a mile east of the town on top of a hill. That:

"They had a house over there, over a meter and had cut-offs and had a by-pass on it. I suppose the T. P. had charge and control of that house. It had their stuff in it. I had no access to the house myself. There was a wooden house, and I guess it was 6x8 feet, or 8x10. The T. P.'s pipe came into that house. It was either a 4 or 6 inch pipe, I do not remember. It was a large pipe. When I say T. & P. Company I mean Texas Pacific Coal & Oil Company. I do not know where the gas came from. The line came in north and south by there, and this branch connected onto it. I don't know where or what wells it come from. There was nothing on that line before it reached the house. Inside that house was a meter, a gas meter, and it come from the east side and come out on the west side, and there was a gas meter in there and two or three big globe valves or gate valves, and then a by-pass around this meter. A gate valve has a gate in it to let the pressure in and out. Those valves do not regulate the pressure or amount of gas that would pass through, but you had to open the valves to get the pressure of the gas to the meter. The amount that these valves opened or closed has something to do with the pressure. Close them, the pressure would be cut off. They could be opened a little. If the gas was consumed on the other end of the line, it would not back up and form a pressure, but if it was wide open it would soon fill the lines up in town. The gas was being used in town from said line and sometimes the use was heavier than at others. If the glove valves were opened, say one-half or one-fourth or entirely, that would have an effect upon the pressure that went out through the lines. The Texas Pacific Coal & Oil Company had charge of those glove valves. * * * I have had quite a bit of experience with this kind of valves. I judge more gas would pass through the valve when you have it fully open. It is my opinion based upon my experience. The Caddo Gas Company's line began just outside of the house. They owned the pipe from the meter on out over the town; that is, they owned the pipe on the west side of the house after it had passed through the house. There was a regulator on the outside up against the house. What I mean by regulator is that it was to regulate the pressure for the gas over town. It was a 2-inch regulator, a 2-inch pipe in it and out of it, or 2-inch out of it; I don't remember what size come into it. There was a way you could set the regulator so as to let a certain pressure through it by putting weights on it and weighting it down so more presssure would come through. You could cut it all the way off. You take the weights off, and it was supposed to balance there and work. But it was not working very good all the time. It was not in very good shape. We would have to load it down with rocks and pipe fittings to keep it open. A certain weight would let so much gas through. That regulator would regulate a very high pressure that was turned into the line. Part of the time it would work, and part of the time it would not.

"I suppose it was a week or something like that before the fire when I last had occasion to do anything with the regulator. As well as I remember it was about that time. I was not

employed by the company at the time of the fire. * * * I was running the shop up at town, and the regulator would not work. It had got froze up, and they built a fire under it. About a week before the fire I went over with a fellow from the gas company to see what was the matter with it. I had been well acquainted with it, and so he asked me to go over, and they had built a fire under it and it had burnt the guage up, and so we took it off and brought it to my shop, and the spring was burnt up, and I had a guage in my shop, and I let Mr. Stephens have that guage, and he took it over and put it on. The guage was a pressure guage to show the amount of pounds going into it. The guage was working properly when I left it. The next time I saw it he ordered one or bought one some time, and he brought mine back to the shop to me. That was after the fire. This guage I let him have come off of an acetylene welding plant—a high pressure guage. It was a guage that would show up to 2,500 pounds. It would register a low pressure anywhere about 50 pounds. I don't think it an accurate guage for that machine. It would register as much as come on it, up to 2,500 pounds. It would just register the amount of gas in the line, or going through the line up to the numbers on the guage—I think it was 2,500 pounds. * * * They could get through the lines at Caddo as much as they had in the other line. The regulator was supposed to regulate the gas, but it did not work, and we always kept it wide open to get as much as we could through the line. It was customarily done that way with the old regulator. I know what had been the condition of the gas pressure for a period of several days just before the house burned up there in Caddo. Well we hadn't had any; most of us were burning wood. They got a little bit down in town, but out in the residence part of town they couldn't get any. Most every one was burning wood. * * * Immediately after the fire, well we had lots of pressure the day of the fire, I know that. I didn't notice it until after the fire. Before the fire we had practically no gas at all down at my place, and after the fire we had all we wanted of it. Plenty of it in the lines. * * * After the fire the main gas line along the street near the Jeffries house was bursted. It burnt there for a good long while after the fire. It was not far from her house. I don't know whether it bursted before or after the fire. I had not known of it before. I passed her house I guess 15 or 20 minutes before it burned—something like that. I did not notice the gas pipe bursted at that time. I believe I would have noticed it if it had been there at the time."

G. L. Taylor, testifying in behalf of the defendant, said that he had charge of everything connected with the transporting of gas from one part of the field to another for the Texas Pacific Coal & Oil Company, and that he knew of the danger of permitting high pressure gas to go into the lines of the Caddo Gas Company. On this point he said:

"I knew it was necessary to have a regulator in there in order to protect the people against the excess pressure. As to whether or not, at the time we made the contract with the Caddo Gas Company, we required them to install a regulator, well, they had their regulator already, We required them to keep and use it. I knew gas was dangerous. We didn't pay any attention to the regulator after it was installed. We told them it would be necessary for them to regulate the gas. We told them it was their duty to do so. We knew it was necessary to regulate the gas. If they wanted to buy the gas it was nothing to us whether they sold high pressure gas or low pressure gas."

There is much other evidence that should possibly be quoted, but to do so would unduly extend this opinion. We will say in a general way that, in substance, we think the evidence shows that the fact that there was little or no pressure in the lines of the Caddo Gas Company was well known, not only to the managers of the latter company, but also through numerous complaints and otherwise to the agents and employees of the appellant company. It also tends to show and authorize the conclusion that the agents and employees of the appellant company well knew that an undue pressure of gas was dangerous and might cause damage such as shown in this case, and that the register of the Caddo Gas Company was weighted down so as to admit all of the gas furnished by the appellant company. The appellant company also had globe valves and other valves that, according to testimony of witness' Hampton, at least in a measure controlled the gas pressure, and, while the appellant company was not the retailer, it was the wholesaler, and the two companies were acting interdependently, and we think that, when the extraordinary pressure of gas was turned into the lines of the appellant company, reasonable care on its part, under the circumstances, required it to see that its valves and the register of the Caddo Gas Company were properly adjusted so as not to cause damage of the character shown in this case. And we think the jury were authorized, under the evidence, in saying that the company was negligent in a failure to exercise such care. It is true that the appellant company offered testimony tending to show that it had not turned in any extraordinary amount of gas; charts were introduced purporting to show that there had been no unusual pressure of gas in the pipe lines of the appellant company, but the undeniable fact seems to be that an extraordinary pressure in fact was turned into the pipe lines of the appellant company and from thence through the unobstructed valves into the pipe lines of the Caddo Gas Company, with knowledge, as there is evidence tending to show, not only that an excessive pressure would be dangerous, but also that the valves and register of the Caddo Gas Company were open.

[4] And we think the jury were the judges of whether they should credit the charts and witnesses who produced them. There was evidence tending to show that at or

about this time, after numerous complaints had been received by the officers and agents of the appellant company, the gas from an additional well—the Veale well—was turned into its lines. The appellant's testimony tended to show that this was done after the fire, but the evidence to this effect on their part, even if credited by the jury, does not seem to be conclusive, and, as before indicated, the evidence as a whole seems conclusively to show that from some source an additional and excessive volume of gas was turned into the lines of the appellant company and flowed thence into the lines of the Caddo Gas Company, for there is no evidence whatever to the effect that the Caddo Gas Company received gas for its use among the citizens of Caddo from any other company or source.

On the whole, we conclude that all assignments of error should be overruled and the judgment affirmed.

### On Motion for Rehearing.

Appellant in addition to complaints of our action in overruling the numerous assignments of error originally presented, with renewed emphasis insists that we erred in overruling its contention that the general demurrer to the plaintiff's petition should have been sustained by the trial court, and that there is no evidence which authorizes the conclusion of the jury that appellant was negligent in turning in or permitting the introduction of an excessive amount of gas in the pipe line of the Caddo Gas Company.

[5] In support of its contention that the general demurrer to the plaintiff's petition is well founded, stress is laid upon the case of Oglesby's Sureties v. State, 73 Tex. 658, 11 S. W. 873, cited by us in our original opinion. The contention is that, because of the allegation in the plaintiff's petition that the "Caddo Gas Company or the Texas Pacific Coal & Oil Company, or the Caddo Gas Company or some of their agents, employees, or representatives" turned into the gas mains in Caddo the alleged excessive pressure of gas, it is uncertain which of the two companies committed the wrong complained of. In disposing of the question on original hearing, we recognized the rule established by the case of Oglesby's Sureties v. State, supra, and other authorities, and expressly stated that the quoted allegation, standing alone, left it uncertain that the Texas Pacific Coal & Oil Company was guilty of the wrongs complained of, and that, if so construed, the demurrers should have been sustained. But, we undertook to show by quotations from subsequent portions of the petition that, construed as a whole, it sufficiently charged that the appellant company as well as the Caddo Gas Company was guilty of the wrongs alleged. That this conclusion is erroneous, counsel for appellant presents a certified copy of the orig-

271 S.W.—8

inal petition in the Oglesby Case, which the Supreme Court held insufficient. The petition alleged, in substance, that Oglesby, on the 4th day of November, 1884, had been elected sheriff and tax collector of Maverick county for the term of two years; that he duly qualified and executed the proper bond for the faithful performance of his duties as such; that later, to wit, on the 2d day of November, 1886, he was again elected sheriff and tax collector of Maverick county, and qualified and gave the proper bond as such; that during the terms he acted as such from 1884 to 1888 he had collected in taxes the sum of $10,779.80, but had retained in his hands and refused to pay over the sum of $1,104.39, to recover which the suit was brought. The petition contained this specific allegation:

"That as the account herein sued upon and hereto attached as an exhibit is for taxes for the year 1886 upon the tax rolls of 1886, it is impossible for plaintiff to say whether or not the money due plaintiff is due as money collected under the said bond of date of December 4, 1884, or as money collected under said bond of date of November 16, 1886, and the sureties of both parties are made defendants herein, to the end that whatever equities that may exist between them on said two bonds, if any, may be equitably adjusted in this suit, and thus a multiplicity of suits avoided by casting the liability where it justly belongs."

In addition to the allegations which we have stated in substance and of those above quoted, the petition further contained allegations to the effect that "the defendants have wholly failed to comply with the terms and conditions of said bond," etc.; that "said Thomas L. Oglesby, sheriff and collector, has wholly failed either to account for, or to pay over to the plaintiff, any portion of the taxes so collected by him, save and except" as above noted; that "the sum of $1,104.39, which amount, with legal interest thereon, is justly owing by defendants to plaintiff"; that said Thomas L. Oglesby and the sureties on the several bonds, naming them, all defendants as aforesaid, by reason of the making, execution, and delivery of the bonds as aforesaid, and the subsequent defalcation of the said sheriff and collector as herein stated, became justly liable and bound, and promised to pay to the state of Texas, the plaintiff herein, the sum of $1,104.39, with interest thereon as prescribed by law at 8 per cent. per annum from maturity; that none of the defendants, though often requested so to do, have ever paid or caused to be paid to the state of Texas all or any portion of the said sum of $1,104.39; but that they and each of them have wholly failed and refused and, after repeated demands, still fail and refuse to pay the same," etc. And the prayer was that the defendants be duly cited and that upon a trial "judgment may be rendered against each and every one

of the said defendants in favor of the plaintiff," etc.

, The exception to the petition as stated by the Supreme Court was that "its allegations did not distinctly show the liability of the sureties on the second bond for the principal's default." This exception the Supreme Court sustained, ruling, in effect, that the petition failed to allege unequivocally the facts which show the unconditional liability of the parties sought to be charged. It is insisted with great earnestness that the petition in the Oglesby Case as a whole more clearly shows the joint liability of the sureties than does the petition in the present case show a joint or several liability of the appellant and the Caddo Gas Company for the wrongs complained of in this case, but we think the cases are clearly distinguishable.

It is to be noted that the exception in the Oglesby Case was in its nature a special one. It pointed out particularly the defect urged, whereas in the case before us the demurrer was a general one, which on its face does not call particular attention to the defect now urged. Moreover, in the Oglesby Case the action was strictly ex contractu, and the sureties on the several bonds were necessarily disconnected, and the specific allegation that it was "impossible for the plaintiff to say whether or not the money due the plaintiff" was due under the bond executed in 1884 or under the bond executed in 1886, necessarily, as it seems to us, excludes an inference from the latter general allegations that the sureties on the several distinct bonds were jointly liable. As observed by the Supreme Court in the Oglesby Case:

"Their obligations were separate and distinct, and the liability of those upon the one bond was in no sense dependent upon the liability of those upon the other. It is true that both sets of sureties were not responsible for the same defalcation, and that from the very nature of the case what the one set was liable for the other was not."

In the petition here under consideration, in addition to allegations quoted in our original opinion, which we concluded relieved the petition as a whole from the uncertainty of the allegation made the ground of objection, we note the following:

"The defendants, each and all of them, well knew, or, if they had used ordinary prudence and diligence would have known, that said gas pressure was too strong and great for the pipes and the plumbing and fixtures for gas purposes of those used by plaintiffs and other citizens using gas in the town of Caddo. * * * That if said high pressure of gas in said mains was not turned on by the defendants, their agents, employees, and representatives, nevertheless they became liable therefor because it was their duty to use ordinary care to prevent a high pressure being turned into the mains and pipes

of said town, by arranging for, fixing, and preparing ordinary safety valves and appliances so as to prevent an accident due to high pressure turned into the mains to which their lines were connected. * * * That said fire was caused by the negligence of the defendants, and the proximate cause of said fire was due to the high pressure of gas in said lines. * * * That if there was a regulator in the gas line to which these plaintiffs were connected the same was defective, insufficient to regulate the gas pressure, and did not regulate the same, because the gas would come and go, sometimes low and sometimes high, showing that said regulator, if any, was insufficient, improper, and not a safe regulator."

[6, 7] We further note that the defendants in this case joined in their answers, making common defense to the action, and in their original answers (to which, in passing upon the general demurrer, we are authorized to look; see Lyon v. Logan, 68 Tex. 521, 5 S. W. 72, 2 Am. St. Rep. 511; Riggs v. Pope, 3 Tex. Civ. App. 179, 21 S. W. 1013, Trust Co. v. Caruthers, 11 Tex. Civ. App. 430, 32 S. W. 837), we find that they pleaded the general denial to "all and singular the allegations in plaintiffs' petition contained, and demand that strict proof be made thereof," and further specially:

"That these defendants specially deny that the pressure was so great and severe that many of the gas pipes, and especially those lying on top of the ground, walked, crawled, or moved from their usual place; and these defendants further specially deny that on said day and date the gas pressure in their said lines was too great or any greater than necessary, and these defendants further specially deny that on said, day and date in question the said fire was caused from any act or acts of them, their agents, servants, and employees."

The answers of the defendants further show that the gas that supplied the town of Caddo was secured from the Texas Pacific Coal & Oil Company, and the undisputed proof on the trial showed that this was true, so that, on the whole, the issue of joint liability of the defendants in this case for the wrongs complained of was presented in the pleadings, and the disjunctive allegation of the petition upon which the general demurrer is founded was apparently ignored or lost sight of in the actual trial of the case. Under such circumstances, the objection urged is theoretical and technical rather than meritorious, and the alternative allegation may safely be disregarded. We accordingly adhere to the conclusion, originally announced, that the trial court did not commit reversible error in overruling appellant's general demurrer.

Appellant further insists with great earnestness that—

"No proof was made of any physical fact, such as other fires, pipes bursting from gas pressure, and stove attachments being blown off or any other occurrences which would con-

stitute legitimate evidence of the excessive gas pressure."

In this connection, attention is called to what is termed a misstatement of some of the facts in our ·original opinion. For instance, we referred to testimony tending to show that there was such a pressure of gas in the pipe lines of the Caddo Gas Company as, in instances, "blew off petcocks on stoves of the inhabitants," and "bursted pipe lines" in the city of Caddo. The statement that petcocks had been blown off of stoves was brought about probably by what has been shown to us as an inadvertent misquotation in one of appellee's original briefs. In this respect the testimony was rather to the effect that the gas pressure was such as to "raise the lids of stoves" and that, instead of pipe "lines" bursted, it should have been stated in the singular; that is, that at least one line had been bursted. But we have again carefully reviewed the testimony, and we think these inaccuracies, if they are such, are immaterial. As indicated in our original opinion, we think the evidence certainly tended to show that just preceding the fire the gas pressure in the lines was very low; that it suddenly became sufficiently strong to move pipe lines and to have either bursted a pipe or some stove connection in the kitchen of appellee and thus cause the fire; that at least "one 2-inch nipple bursted and split open and roared; that at least one of the supply lines in the city was moved thereby as much as 6 inches;" that in one residence a witness noticed "a blaze flash up from the stove." She said:

"It didn't blow any connection off in her stove but it lifted the caps along. That was about the time we heard this shrieking (of pipes)."

Another witness testified that her son had gas in his house, and "it came on real strong and blew the caps of the stove." Yet another witness testified that just before the fire they did not have any pressure in the line that could be used to advantage, and that they noticed the fumes of the gas and turned it on and found a lot more pressure than they had had.

"We had a long iron drum on the floor, and we turned it in that. It moved the barrel. That was about 5 minutes before the fire occurred."

The facts insisted upon, that like occurrences in other residences in Caddo were not shown, may be accounted for on the theory that the gas would naturally be relieved, in a measure at least, by increased use by the inhabitants and by escape from the pipe or pipes shown to have bursted. It is true testimony in behalf of appellant tended strongly to show that there was no excessive pressure as evidenced by certain charts introduced by them, but these charts, if accepted as conclusive, would establish the fact that the pressure at the time of the fire was not greater than had been for several days prior thereto, and we think the testimony in behalf of appellee, hereinbefore briefly referred to was sufficient to authorize the jury to draw a different conclusion. It is true that appellant's superintendent, Mr. G. L. Ratcliffe, while acknowledging that he had received complaints of insufficient gas at Caddo, stated that the additional gas received from the Veale well had been turned into their lines subsequent to the fire in question. But it appeared from his testimony that he was at the headquarters of the company, some distance from the town of Caddo, and that he himself did not turn the Veale well gas into the lines, but that an employee, one Holland, did this. Mr. Ratcliffe testified:

"There were complaints by the people of Caddo at times when gas was short. As I testified before, the people in Caddo were complaining about freezing, and we went to work on the Veale well to turn it in. * * * I didn't personally turn the gas into the lines; it was done under my orders. We haven't any records that show exactly when a well is turned on. I don't believe we have any record that shows just when the Veale well was turned in. The meter charts show it, but I haven't got those here. * * * I am not certain about the record as to when that well was turned in. I didn't look that up before I left the office. I didn't even know I was coming until early this morning. All I remember is that it was after the fire. * * * A man by the name of Holland turned the Veale well into our main line. I have never talked to him about it. * * * There was a snow about that time I believe. After the snow we were working on the Veale well. I don't think we worked on it before. We might have and might not. This cold spell I have reference to was when they were complaining that they were not getting gas in Caddo."

[8, 9] Under these circumstances, it is significant that appellant did not produce the meter charts mentioned nor explain the absence of the witness Holland. The jury doubtless drew the inference, as under a well-settled rule they would be authorized to do, that, had the meter charts been produced and the witness Holland required to testify, the testimony would have been unfavorable to appellant.

Without further discussion, we conclude that appellant's motion for rehearing should be overruled.